UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



09 CIV 10058

―――――――――――――――――――――――― x
THE BOARD OF TRUSTEES OF THE          : Civil Action No.
CARPENTERS LABOR MANAGEMENT           :
PENSION FUND, on Behalf of Itself and All : <u>CLASS ACTION</u>
Others Similarly Situated,            :
                                      : COMPLAINT FOR VIOLATION OF THE
            Plaintiff,                : EMPLOYEE RETIREMENT INCOME
                                      : SECURITIES ACT OF 1974
    vs.                               :
                                      :
STATE STREET BANK AND TRUST           :
COMPANY and STATE STREET GLOBAL       :
ADVISORS, INC.,                       :
                                      :
            Defendants.               :
                                      : <u>DEMAND FOR JURY TRIAL</u>
―――――――――――――――――――――――― x

FILED
U.S. DISTRICT COURT
2009 DEC -8 PM 2:28
S.D. OF N.Y.

Plaintiff The Board of Trustees of the Carpenters Labor Management Pension Fund, as trustee and administrator of the Carpenters Labor Management Pension Fund (the "Pension Fund" or the "Plan"), on behalf of the Pension Fund and a class of all other similarly situated trustees, administrators, and other fiduciaries (the "Class") of other similarly situated retirement plans (the "Class Plans"), brings this class action against defendants State Street Bank and Trust Company and State Street Global Advisors, Inc. (hereinafter collectively "State Street" or "Defendants") and states as follows:

## SUMMARY OF THE ACTION

1. On November 29, 1999, the Pension Fund and State Street entered into an agreement in which the Pension Fund appointed State Street as Investment Manager (as defined in §3(38) of the Employee Retirement Income Security Act of 1974 ("ERISA")) for certain assets of the Pension Fund (hereinafter the "Agreement"). Those certain assets were deposited into an account by the Pension Fund, and with those assets State Street was directed to acquire units of the Russell 1000 Value Index Securities Lending Fund (the "Russell 1000 Fund") which is operated and maintained by State Street. Pursuant to the Agreement, State Street acknowledged that it is a fiduciary of the Pension Fund and that it owes certain fiduciary duties to the Pension Fund, including the duties of care, skill, prudence, and diligence.

2. State Street breached those fiduciary duties and the Agreement by investing certain collateral it received, as part of its securities lending program, in highly risky and toxic mortgage-backed securities and collateralized debt obligations ("CDOs"). As a direct result of those risky and grossly imprudent investments, the collateral investment pools (for which State Street is also the investment manager and which are utilized by State Street to support its securities lending program) were illiquid and its securities lending funds, including the Russell 1000 Fund, also became illiquid.

3. In response, on October 7, 2008, State Street announced that it would act in further derogation of its legal responsibilities and in breaching the Agreement when, for the first time, it notified the Pension Fund that in derogation of State Street's obligations and fiduciary duties it had "modified the withdrawal procedures for clients that are withdrawing their interest in the [Russell 1000] fund to switch to a non-lending fund or to terminate their investment in the [Russell 1000] fund." Nothing in the Agreement or ERISA grants State Street the right or discretion to withhold any assets or funds from the Pension Fund which are invested in the Russell 1000 Fund on behalf of the Pension Fund. Nor was State Street granted any authority or discretion by the Pension Fund to modify the Pension Fund's withdrawal rights. However, the Pension Fund was told:

> *[I]f you want to liquidate your investment in a [State Street] lending fund or switch from a lending fund to a non-lending fund, you will receive a portion of the withdrawal proceeds in cash and a portion in an interest in the underlying collateral pool (such interest will be subject to the same restrictions).* The percentage of the withdrawal proceeds to be received in interests in the underlying collateral pool will vary depending upon the percentage of a lending fund's securities that are out on loan.

4. The Pension Fund and the Class Plans are now stuck with an undetermined percentage of their proceeds in the form of a *pro rata* share of interest in the underlying securities lending collateral pool. State Street has unilaterally imposed these improper withdrawal restrictions even though they constitute a breach of its fiduciary duties owed to the Pension Fund and the Class Plans and even though it has no contractual or legal right to do so. This form of distribution would necessarily cause incalculable losses to plaintiff and members of the Class because, among other reasons, the collateral pools contain, on information and belief, illiquid assets or assets which are nearly illiquid, including residential and commercial mortgage-backed securities and mezzanine CDOs. It is precisely because State Street invested in such toxic assets that the Russell 1000 Fund and other securities lending funds and their underlying securities lending collateral pools suffered such extreme illiquidity.

5. State Street's conduct in (i) investing cash collateral it received in connection with its securities lending program in highly risky and toxic asset-backed securities, and (ii) restricting plaintiff's withdrawal rights in the Russell 1000 Fund constitutes both a breach of State Street's fiduciary duties imposed under ERISA and a breach of contract.

## PARTIES

6. Plaintiff is the trustee and plan administrator of the Carpenters Labor Management Pension Fund which was established on September 22, 1971 and is located in Washington, D.C. The Plan currently has over 10,000 participants.

7. Defendant State Street Bank and Trust Company is a wholly owned subsidiary of State Street Corporation, a publicly registered financial holding company. State Street Bank and Trust Company is a bank organized under the laws of the commonwealth of Massachusetts, which has its principle place of business in Boston, Massachusetts. State Street Bank and Trust Company provides investment servicing and investment management services; as of June 30, 2007, it had $1.9 trillion of assets under management.

8. Defendant State Street Global Advisors, Inc. ("State Street Global"), a wholly-owned subsidiary of State Street Corporation, is a Delaware corporation with its principle place of business in Boston, Massachusetts. State Street Global has described itself as a "division" of State Street Bank and Trust Company and as the "Investment Arm" of State Street Corporation.

## JURISDICTION AND VENUE

9. Plaintiff seeks relief under the civil enforcement remedies provided by ERISA against fiduciaries pursuant to ERISA §§404, 406, 409 and 502(a) (29 U.S.C. §§1104, 1106, 1109, 1132(a)). This Court has exclusive jurisdiction over this action and Defendants pursuant to 28 U.S.C. §§1331 and 1332, and ERISA §502(e)(1) and (2) (29 U.S.C. §1132(e)(1) and (2)).

10. Venue of this action in the Southern District of New York is proper pursuant to ERISA §502(e)(2) (29 U.S.C. §1132(e)(2)) because relevant retirement plans are administered in this District and Defendants do business in this District.

## FACTUAL ALLEGATIONS

### Defendants' Russell 1000 Fund

11. Defendants offer a Russell 1000 Value Index SL (Securities Lending) Fund, which is an investment fund for tax exempt retirement plans. It follows a "passive" or "indexing" investment approach which seeks to track or "match" the performance of the Russell 1000 Index. Defendants do this by "invest[ing] in the securities comprising the Index, in the same proportions as they are represented in the Index."

12. The Russell 1000 Fund participates in a securities lending program sponsored by defendant State Street Bank and Trust Company, which is the lending agent. It lends securities in the fund in exchange for collateral and a lending fee. Defendant State Street Bank and Trust Company then invests the collateral in a collateral reinvestment fund which it refers to as the "Collateral Pool."

13. Defendants lend securities of the Russell 1000 Fund to securities borrowers, and defendant State Street Global, as the Investment Manager of the Collateral Pool, invested portions of the collateral in risky mortgage-backed securities and CDOs. Many of these risky, fixed income investments have now become illiquid.

### The Parties' Investment Management Agreement

14. On November 29, 1999, the parties entered into an agreement in which plaintiff appointed State Street as Investment Manager, as defined under §3(38) of ERISA, for certain assets of the Pension Fund. Pursuant to the investment objectives set forth in the Agreement, State Street was to purchase shares in the Russell 1000 Fund with those assets.

15. Under the Agreement, State Street assumed the following duties:

State Street shall exercise the same care in the safekeeping of the assets held in the Account, including the Units, as the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, consistent with ERISA Section 404(a)(1)(B).

16. The Agreement also stated, "The terms and conditions of the declaration of trust of the State Street Trust, including the Fund Declaration creating the Fund, are hereby adopted and incorporated by reference into the Plan."

17. Neither the Agreement nor the Fund Declaration contains a provision allowing State Street to restrict withdrawals from the Russell 1000 Fund as it has improperly and arbitrarily done.

**Defendants' Unilateral Implementation of Severe Withdrawal Restrictions**

18. On October 7, 2008, State Street notified investors in its securities lending funds, including its Russell 1000 Fund, that it had unilaterally "modified the withdrawal procedures for clients that are withdrawing their interest in the lending fund to switch to a non-lending fund or to terminate their investment in the lending fund." Attempting to justify its actions on the basis that "no participant in our securities lending program has ever experienced a loss from the failure of a borrower to return securities," it nevertheless unilaterally restricted the withdrawal options for its investors. It informed investors as follows:

> Consequently, instructions in good order received on or after October 3, 2008, for withdrawals that represent full or partial liquidations (other than resulting from normal activity) from our lending funds or transfers from lending to non-lending funds at the plan or institutional account level will be completed as follows: *if you want to liquidate your investment in a SSgA lending fund or switch from a lending fund to a non-lending fund, you will receive a portion of the withdrawal proceeds in cash and a portion in an interest in the underlying collateral pool (such interest will be subject to the same restrictions)*. The percentage of the withdrawal proceeds to be received in interest in the underlying collateral pool will vary depending on the percentage of a lending fund's securities that are out on loan.

State Street confirmed its unilateral and unlawful actions by saying that "[a]s liquidity conditions improve over time, we will reassess the need for institutional account and plan level withdrawal restrictions as appropriate."

19. On March 23, 2009, State Street notified its investors, including plaintiff, that it was further restricting investors' withdrawal rights. In doing so, it acknowledged that the securities lending Collateral Pool included highly risky and otherwise toxic assets, including "asset-backed securities." It also acknowledged that State Street had allowed the collateral pools to drop below $1 per unit on a mark-to-market value basis. As a result, State Street announced that it was adopting "new investment guidelines for the Collateral Pools" and that it was "necessary to revise further the withdrawal parameters that had been in place on the Lending Funds since last October," stating as follows:

> 1. *New Monthly Withdrawal Parameters*
>
> ***Until at least the end of 2009, withdrawal requests from each Lending Fund will be limited to a per month maximum of between 2% to 4% of your account's net asset value in that Lending Fund at the time of the redemption request.*** If a Lending Fund (by a virtue of being a fund of funds) invests in more than one Collateral Pool where the liquidity allocations (either 2% or 4%) are different, then the maximum per month withdrawal percentage will be determined based on the weighted average of the underlying funds exposure to the two different Collateral Pools at the time of the redemption request. . . . In any month that SSgA does not receive a request for the maximum monthly percentage from you, you will be able to accumulate the right to redeem the remaining percentage at a later date (an "Accumulated Withdrawal Right"), thereby accumulating available liquidity in a Lending Fund over time.

20. However, at the same time that State Street was allowing Accumulated Withdrawal Rights, it stated that it was "amending the fund declarations for the Lending Funds to expressly state that State Street has the obligation as trustee to give priority over other investors to redemption requests from investors with Accumulated Withdrawal Rights in circumstances where there is limited available liquidity, including where the withdrawal parameters have been further limited."

- 6 -

21.     Finally, in its March 23, 2009 notification to investors, State Street attempted to amend the trust declarations for the various securities lending investment funds in order to grant itself discretion to restrict withdrawals after the fact. It stated as follows:

> Notwithstanding any other provision of the Fund Declaration or the Declaration of Trust to the contrary, and in addition to any other authority granted to the Trustee thereunder, in the interest of fair and equitable treatment of all Participants and the protection of the Fund, ***the Trustee may in its sole discretion adopt and implement redemption practices and policies with respect to the rights of Participants to withdraw or redeem Units from the Fund*** .... The Trustee may in its sole discretion treat one or more Participants differently from other Participants in determining the extent to which a particular Participant is entitled to withdraw, the per Unit redemption amount to be paid to a particular Participant, the timing, manner (cash, in-kind or combination thereof) and frequency of redemption payments, and any other matters relevant to a Participant's withdrawal.

22.     State Street's after-the-fact attempt to grant itself "sole discretion" to impose withdrawal restrictions is patently improper and itself constitutes a breach of State Street's fiduciary duties. The withdrawal restrictions had been in place for over five months before State Street attempted to grant itself sole discretion to implement such restrictions. Moreover, such withdrawal restrictions would never have been required if State Street had not gambled with assets of plaintiff and other tax exempt retirement plans on asset-backed securities and other highly risky investments as part of its securities lending program. Rather than investing in the Russell 1000 Fund, a fund that purported to track the Russell 1000 Index, fund assets were in fact diverted – through State Street's securities lending program – to asset-backed securities in violation of Defendants' fiduciary duties, the Agreement and the fund declarations.

## DEFENDANT'S FIDUCIARY DUTIES

23.     State Street is a fiduciary in that it exercised authority or control over the management or disposition of the assets of the Pension Fund and, upon information and belief, the Class Plans. ERISA §3(21) (29 U.S.C. §1002(21)).

24. Pursuant to ERISA §404(a)(1) (29 U.S.C. §1104(a)(1)), Defendants had the following duties:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
>
> (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>
> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and title IV.

25. State Street also had the duty to refrain from engaging in prohibited transactions. Section 406(b)(1) of ERISA (29 U.S.C. §1106(b)(1)) provides, in pertinent part, that

> (b) Transactions between plan and fiduciary. A fiduciary with respect to a plan shall not –
>
> (1) deal with the assets of the plan in his own interest or for his own account . . . .

26. Despite Defendants' fiduciary obligations to plaintiff and members of the Class, State Street invested large portions of the collateral received through its securities lending program in "asset-backed securities" – investments that were highly risky in light of known existing market conditions, knowing that regardless of the investment outcome, the loss would be borne by the Pension Fund and Class Plans.

27. State Street invested a large percentage of the securities lending collateral in risky investments such as asset-backed securities, including mortgage-backed securities, CDOs, and, on information and belief, floating rate notes, and investment vehicles that invested in asset-backed securities themselves. As a result, certain assets within the securities lending collateral pools became illiquid, and the collateral pools themselves became illiquid.

28. State Street made these perilous and improper investments despite myriad news accounts chronicling the risky nature of asset-backed securities.

29. For example, on December 12, 2006 – almost three years ago – *The Wall Street Journal* raised red flags about investments in asset-backed securities:

> THE CRACK in the debt market's otherwise-strong foundation could be subprime mortgages.
>
> Investors have been gobbling up risky debt lately, from junk bonds issued by struggling auto makers to loans used to finance mega-buyouts. But in subprime mortgages – an especially risky corner of the debt market – worries are keen.
>
> The $1.3 trillion subprime mortgage market, which is a bit more than a tenth of the overall mortgage market, caters to home buyers with scuffed credit records or who might have trouble paying off their mortgages. Delinquencies on some of these loans are rising and some smaller lenders are folding, which affects debt that is backed by the loans.

30. On February 13, 2007, *The Wall Street Journal* again wrote:

> ***While investing in asset-backed derivatives isn't new, the stakes are getting higher as a steady stream of negative news around these riskier investments is hammering this small corner of the credit markets.***
>
> The rising inability of subprime-mortgage borrowers to meet their payments amid higher interest rates has caused sharp spikes in the ABX index, the derivative index tracking subprime mortgages, as well as individual asset-backed derivatives linked to specific loan deals. That's because the cost of protecting these asset-backed securities against a possible default increases, leading to wider trading levels on the index.

31. On April 4, 2007, *The Wall Street Journal* warned specifically about the types of risky investments utilized by State Street:

- 9 -

> Mutual funds are increasingly using complex financial products called derivatives to hedge their bets or boost their returns – and that's raising concerns among regulators and fund watchdogs.
>
> Institutional investors such as hedge funds have long used derivatives, which include options, futures, swaps and other, more exotic fare. But now these instruments are increasingly appearing in ordinary diversified stock and bond funds that often serve as core holdings for small investors.
>
> \* \* \*
>
> ***Funds' use of derivatives – which Warren Buffet once called "financial weapons of mass destruction" – is growing as the instruments become easier to trade and as mutual funds aim to stand out in a crowded field.*** More automated trading of derivatives and increased use by fast-growing hedge funds have helped make the market more accessible to mutual funds. And with more than 8,000 mutual funds on the market, many managers believe it's not enough to match a market index. They want to beat the market – and derivatives often help.
>
> While many newer, more-exotic mutual funds plainly advertise their derivatives strategies, the instruments may play an equally important, but less obvious, role in some plain-vanilla funds. The AIM Income and Fidelity Investment Grade Bond funds, for example, have been around for decades and, at first glance, may look like straightforward bond portfolios. But as of the end of February, the Fidelity fund had invested about 18% of its assets in futures, options and swaps, while roughly 70% of the AIM fund's assets were in derivatives.
>
> Derivatives can be used to boost returns, increase yield, get access to more-exotic asset classes like commodities or simply reduce risk. Indeed, many types of derivative-heavy funds thrived in recent years amid relatively placid markets. But in recent weeks, as markets have gyrated more wildly, the vulnerability of some of these funds has become more apparent.
>
> Many of these funds use an options strategy that generally works best in relatively flat markets, not one that's moving sharply up or down. And some funds that use derivatives to produce returns that are a multiple of a selected market index saw sharp declines during the recent broad market downturn.
>
> Another concern: Many funds that employ derivatives strategies can hit fund investors with hefty tax bills, since these funds tend to trade often and can generate more short-term capital gains.
>
> At the same time, the people responsible for overseeing mutual funds are raising concerns about derivatives. ***"I am not trying to say that funds should not invest in these instruments, but I am saying that you should do a lot of work up front before you wade into uncharted territory***," said Securities and Exchange Commission investment-management division head Andrew Donohue last week,

addressing a mutual-fund industry group, noting that "funds very often are newcomers" to derivative and other sophisticated instruments.

32. News accounts continued throughout 2007 warning investors about the risks associated with asset-backed securities. On August 13, 2007, *The Wall Street Journal* wrote that "[e]xotic financial instruments linked to subprime mortgages are showing huge losses in debt markets and weighing on companies from lenders to banks to insurers."

33. Despite the avalanche of warnings about the risky nature of these investments and in contrast to the stated and agreed investment goals and objectives of the Agreements, State Street continued to invest in these risky investment vehicles.

34. Defendants' failure to comply with their obligations set forth in the Agreement, in direct violation of State Street's duties of care, skill, prudence and diligence under ERISA, directly harmed the Pension Fund and, upon information and belief, the Class Plans, in that (a) State Street severely restricted the withdrawal rights in the Russell 1000 Fund and similar securities lending investment funds for tax exempt retirement plans, due to liquidity issues, and (b) the securities lending collateral not only earned less than it would have earned if invested by a reasonably prudent fiduciary, but also lost principal.

## CLASS ACTION ALLEGATIONS

35. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3) on behalf of a Class of all trustees, administrators, and other fiduciaries of retirement plans which entered into agreements with State Street to act as Investment Manager for their plans and whose funds were invested by State Street (the "Class"). Excluded from the Class are: (a) Defendants; (b) the subsidiaries and affiliates of State Street; (c) any person or entity who is a partner, executive officer, director or controlling person of State Street; (d) any entity in which State Street has a controlling interest; (e) State Street's directors' and officers' liability

insurance carriers, and any affiliates or subsidiaries thereof; and (f) the legal representatives, heirs, successors and assigns of any such excluded party.

36. While the exact number of Class members is unknown to plaintiff at this time, plaintiff believes and therefore avers that Class members number in the hundreds, if not thousands.

37. Plaintiff's claims are typical of the claims of the members of the Class in that, upon information and belief, all Class members entered into identical or virtually identical agreements with State Street on behalf of Class Plans in which State Street agreed to act as Investment Manager and invested funds in the Russell 1000 Fund, and other similar securities lending funds and are now subject to State Street's withdrawal restrictions.

38. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class litigation. Plaintiff has no interests that are adverse or antagonistic to the Class.

39. Plaintiff anticipates that there will be no difficulty in the management of this litigation as a class action. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by any individual Class Plan may be relatively small, and plaintiff seeks injunctive relief, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein. Further, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class and the Class Plans which would establish incompatible standards of conduct for the party opposing the Class.

40. Defendants have acted on grounds generally applicable to the Class and the Class Plans with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

41. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether State Street is a fiduciary; (b) whether State Street violated its obligations set forth in the Agreement; (c) whether State Street violated its fiduciary duties of prudence and/or loyalty; (d) whether State Street engaged in prohibited transactions in connection with investments of securities lending collateral; (e) whether the Pension Fund and the Class Plans suffered any losses as a result of State Street's actions; and (f) whether plaintiff and the Class would suffer irreparable injury by the continuation of State Street's conduct, including the withdrawal restrictions it has implemented, complained of herein.

42. On information and belief, the names and addresses of those persons and entities that have similar agreements, as defined above, with State Street are available from State Street. Notice may be provided to such Class members via first class mail using techniques and a form of notice similar to those customarily used in class actions.

## COUNT I

### Violation of ERISA §404 (29 U.S.C. §1104)

43. Plaintiff repeats and realleges the allegations contained in ¶¶1-42 as if fully set forth herein.

44. At all relevant times, Defendants acted as fiduciaries within the meaning of ERISA §3(21)(A) (29 U.S.C. §1002(21)(A)) by exercising authority or control with respect to the investment of assets in the Pension Fund.

45. Defendants have a duty to invest the securities lending collateral prudently based on the standards of a reasonably prudent fiduciary.

46. Defendants have a duty of loyalty to invest the securities lending collateral solely in the exclusive interests of the Pension Fund and Class Plans and their participants and beneficiaries and for the exclusive purpose of providing retirement benefits.

47. Defendants have a duty to monitor the securities lending collateral investments continuously to ensure that they were at all times proper. If a collateral investment became imprudent or improper, Defendants have a duty to act immediately to protect the Plan from any investment harm.

48. Defendants failed to invest the securities lending collateral in safe and prudent investments as required by the Agreement. Instead, Defendants invested the security lending collateral in highly risky and toxic investments, including mortgage-backed securities and CDOs in direct violation of the Agreement.

49. Defendants also failed to monitor the securities lending collateral investments to ensure they were at all times proper investments in accordance with the Agreement and, therefore, improperly maintained the imprudent investments.

50. No reasonably prudent fiduciary would have invested the securities lending collateral in the investments selected by Defendants in their complete and sole discretion under the Agreement, or reasonably known market conditions. Further, no reasonably prudent fiduciary would have maintained those investments.

51. Defendants' failure to invest the securities lending collateral in a prudent manner constitutes a breach of Defendants' fiduciary duty of prudence pursuant to ERISA §404(a)(1).

52. Moreover, Defendants' actions were designed to increase profits earned by Defendants from securities lending in disregard of the risk of losses that could be suffered by the Plan.

53. Defendants favored their own interests in gambling to make profits without any reasonable regard to losses that could be suffered by the Plan.

54. Defendants earned substantial fees and profits as a result of acting in their own self-interest.

55. By employing a "heads I win, tails you lose" investment strategy that was highly risky to the Pension Fund and Class Plans for their own benefit, Defendants violated the duty of loyalty under ERISA §404(a)(1).

56. Defendants are liable under ERISA §409, which provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

57. Defendants are liable under ERISA §502(a)(2) to restore to the Pension Fund and Class Plans all losses due to Defendants' breaches, as well as any profits that would have been earned had the securities lending collateral been prudently invested.

58. Defendants are also liable under ERISA §502(a)(2) for imposing withdrawal restrictions with respect to the Russell 1000 Fund and other similar funds with withdrawal restrictions. Defendants are thus liable under ERISA §502(a)(2) to rescind any and all such withdrawal restrictions.

59. The Pension Fund and Class Plans face significant, irreparable harm if Defendants are permitted to continue to violate duties owed to plaintiff and the Class.

## COUNT II

### Violation of ERISA §406 (29 U.S.C. §1106)

60. Plaintiff repeats and realleges the allegations contained in ¶¶1-59 as if fully set forth herein.

61. At all relevant times, Defendants acted as fiduciaries within the meaning of ERISA §3(21)(A) (29 U.S.C. §1002(21)(A)) by exercising authority or control concerning the investment, management or disposition of the Pension Fund assets.

62. Defendants dealt with the securities lending collateral, a Pension Fund asset, in their own interest or for their own account in that they invested the collateral for the express purpose of making investments for their own financial benefit and earning profits for themselves and at the expense of the Pension Fund and Class Plans in violation of ERISA §406.

63. By the acts, transactions and courses of conduct alleged herein, Defendants caused losses to the Pension Fund and Class Plans, and have improperly restricted access to the assets of the Pension Fund and Class Plans invested in the Russell 1000 Fund and other similar State Street securities lending funds.

64. Under ERISA §502(a)(2), Defendants are required to pay damages to the Pension Fund and Class Plans and must rescind all withdrawal restrictions imposed on the Russell 1000 Fund and other similar securities lending funds.

65. The Pension Fund and Class Plans face significant, irreparable harm if Defendants are permitted to continue to violate duties owed to Plaintiff and the Class.

## COUNT III

### Breach of Contract

66. Plaintiff repeats and realleges the allegations contained in the ¶¶1-65 above as if fully set forth herein.

67. At all relevant times, State Street failed to fulfill its obligations to plaintiff and the Class under the Agreements by (i) engaging in a continuous course of performance and investing with respect to the collateral pools underlying its securities lending program in which it invested in highly risky asset-backed securities, and (ii) by severely restricting withdrawal rights with respect to the Russell 1000 Fund and other securities lending investment funds it maintains for tax exempt retirement funds.

68. Plaintiff and members of the Class performed their contractual obligations by appointing State Street the Investment Manager of certain assets contained in their tax exempt retirement plans and by making the payments required under their Agreements to State Street.

69. State Street materially breached and repudiated its duties under the Agreements with plaintiff and the Class by, *inter alia*:

    (a) investing cash collateral received in connection with its securities lending program in highly risky asset-backed securities; and

    (b) severely restricting the withdrawal rights of plaintiff and the Class beginning October 3, 2008 and continuing to date.

70. By reason of the foregoing, plaintiff and members of the Class have been or will be damaged in an amount to be determined at the trial of this action.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment and preliminary and permanent relief, in plaintiff's favor and in favor of the Class and against Defendants as follows:

    A. Declaring that this action is properly maintainable as a class action, and certifying plaintiff as class representative and plaintiff's counsel as class counsel;

    B. Declaring that Defendants' conduct complained of herein was in violation of Defendants' fiduciary duties;

C. Declaring that Defendants have engaged in prohibited transactions in violation of §406 of ERISA;

D. Declaring that Defendants' withdrawal restrictions beginning October 3, 2008, and continuing to date, constitute a breach of the Agreements;

E. Issuing an order, pursuant to ERISA §§409(a) and 502(a)(2), compelling disgorgement and/or restitution and all other remedial relief as the Court may deem appropriate;

F. Issuing an order enjoining Defendants from any further violations of their fiduciary obligations, including enjoining Defendants from enforcing any withdrawal restrictions and implementing any additional withdrawal restrictions on assets of the Pension Fund and Class Plans;

G. Ordering Defendants to pay plaintiff, the Pension Fund, the Class Plans, and the Class such damages as plaintiff and the Class sustained as a result of Defendants' misconduct, including losses and lost profits, and damages based on all withdrawal restrictions imposed by Defendants and the profits Defendants earned from the improper investment of the securities lending collateral;

H. Ordering an accounting;

I. Imposing a constructive trust, in favor of plaintiff and the Class, upon any amounts by which Defendants were unjustly enriched at the expense of plaintiff and the Class as a result of Defendants' breaches of fiduciary obligations, breach of contract and other wrongful conduct;

J. Awarding attorneys' fees pursuant to §502(g) of ERISA (29 U.S.C. §1132(g)) and/or the Common Fund Doctrine;

K. Awarding pre- and post-judgment interest; and

L. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff, individually and on behalf of all members of the proposed Class, hereby demands a trial by jury on all issues to triable.

DATED: December 8, 2009

COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN

/s/ Samuel H. Rudman
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone: 631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
THEODORE J. PINTAR
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: 619/231-1058
619/231-7423 (fax)

DeCARLO, CONNOR & SHANLEY
JOHN T. DeCARLO
533 South Fremont Avenue, 9th Floor
Los Angeles, CA 90071-1706
Telephone: 213/488-4100
213/488-4180 (fax)

Attorneys for Plaintiff